IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 19, 2021

## STATE OF TENNESSEE v. KHAMPHONH XAYYASITH

**Appeal from the Criminal Court for Davidson County**
No. 2019-C-1623      Steve Dozier, Judge

_____

## No. M2020-00379-CCA-R3-CD

_____

The Defendant, Khamphonh Xayyasith, was convicted by a Davidson County Criminal Court jury of three counts of aggravated assault, a Class C felony, and domestic assault, a Class A misdemeanor. *See* T.C.A. §§ 39-13-102 (2018) (subsequently amended) (aggravated assault); 39-13-111 (2018) (domestic assault). The trial court merged the aggravated assault convictions and imposed concurrent sentences of fifteen years for aggravated assault and eleven months, twenty-nine days for domestic assault. On appeal, the Defendant contends that (1) the evidence is insufficient to support his aggravated assault convictions, (2) the trial court erred by admitting a recorded jail telephone call, and (3) his sentence is excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Martesha L. Johnson, District Public Defender; and Jeffrey A. DeVasher (on appeal), Jonathan Wing (at trial), and Casey Elliot (at trial), Assistant District Public Defenders, for the appellant, Khamphonh Xayyasith.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jenny Charles and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to two October 2018 incidents, which involved Sokonthea Chek, the mother of the Defendant's children. The Defendant was charged with three counts of aggravated assault based upon the alternative theories that he caused the victim serious bodily injury, that he caused bodily injury and employed or attempted to

employ strangulation, and that he used or displayed a deadly weapon. He was likewise charged with domestic assault related to a separate incident.

At the trial, the victim testified that she had known the Defendant approximately thirteen to fifteen years and that they shared a son and a daughter. The victim said that her children were ages four and ten in October 2018. She said that in late September and early October, she lived with her parents and children but that the Defendant lived with the Defendant's sister and her seven children. The victim explained that her relationship with the Defendant had been "on again, off again" and that they were attempting to work on their relationship. She said that her cell phone agitated the Defendant and that he began wanting to look through her phone's content. She said that she began working as a model, that the Defendant "approved" initially, that his behavior changed, and that she became concerned. She said that on one occasion, the Defendant took her phone, looked through it, and accused her of "things." She said that on another occasion, the Defendant broke her phone, which she replaced.

The victim testified that the children lived with her the majority of the time but that the children visited the Defendant at his sister's home. The victim said that during September and October 2018, the Defendant drove a convertible BMW.

The victim testified that on Sunday, October 7, 2018, she took the children to the Defendant's sister's home for the children to visit the Defendant. The victim recalled that the Defendant's sister was not home and said that the Defendant asked for her cell phone, that he looked at photographs on her phone, and that he accused her of being unfaithful. She said that the Defendant asked questions and began beating her. She said that the Defendant strangled her at one point during the incident. She said that she was scared, that the Defendant asked if she were lying to him, and that the Defendant wanted her to say she had lied to him. She said that the Defendant began "whipping" her with a coaxial cable cord, which caused pain. She described the cord as the type that screwed into the back of a television and had copper wires protruding at the end. She said that the Defendant's beating her was constant and that she did not count the number of times the Defendant struck her with the cord. She said that the Defendant stood while she sat on the living room couch when the Defendant began striking her. She said that as the Defendant struck her with the cord, he told the victim not to lie and ordered her to tell him what she had done. She said he stated that she had done "this" and that she had been unfaithful. She said that at one point, the Defendant "mentioned" he would place her and the children inside the trunk of a car and set the car on fire. She said she admitted to things that she had not done because she was scared and because she thought telling him what he wanted to hear would make him stop beating her.

-2-

The victim testified that she did not defend herself or attempt to take the cord from the Defendant because she thought he would "use that against" her and because she believed she should not harm anyone under any circumstances. She said that the Defendant struck her with the cord on her arm, leg, and back. She said that at some point, the Defendant placed his hands around her neck and that his fingernail punctured the skin on her neck. She described the amount of pressure applied to her neck as an eight on a scale from one to ten. When asked if she was rendered unconscious, she said that she felt dizzy, could not speak anymore, and had blurred vision. She said the Defendant squeezed her neck for probably five minutes, although it felt like thirty seconds. She said that as the Defendant squeezed her neck, he told her to tell him the truth and not to lie to him but that she could not speak. The victim stated that after the incident, her pain level was a ten and that she felt as though she could not walk out of the home because she had a "sleepy feeling." She said that her then-four-year-old son entered the room during the incident and that the Defendant yelled at their son to leave the room.

The victim testified that on October 8, 2018, she stayed at the home with her children because she could not move from the pain. She thought the Defendant would have beaten her if she attempted to leave with the children. She said that she could not walk without assistance and could not care for her children. She said that the Defendant apologized and attempted to care for her, that they had sexual intercourse, and that she "gave in" because she feared he would hurt her if she were not intimate with him. She said that the Defendant had her cell phone and continued to allege she had been unfaithful. She said that the Defendant, likewise, had taken their daughter's phone. She said the Defendant did not strike her on October 8.

The victim testified that she and the children were unable to leave the home until the morning of October 9, 2018, and that the Defendant returned her and her daughter's cell phones before they left. The victim said that she drove her son to school and that afterward, she drove to the hospital. She said her daughter assisted her as they walked into the emergency room. The victim said that she had bruises on her arm, back, and leg and had a puncture wound on her neck. She identified photographs of her injuries and said the red markings on her body were caused by the cord striking her and that a wound to her shoulder was caused by the cord when it "pinched that part." She identified lacerations and bruises on her arms, legs, and back, and a puncture wound on her neck. The photographs were received as an exhibit.

The victim testified that she had scars on her leg and neck from her injuries. She displayed one scar on her leg to the jury and described it as "kind of a track mark." She said that the scar on her neck was caused by the puncture of the Defendant's fingernail but that she had since covered the scar with a tattoo to make it less visible. The victim's

medical records were received as an exhibit. She stated her injuries prevented her from working for an unspecified time. She said that the injury to her leg, caused by one of the copper wires, became swollen and infected, that she returned to the hospital for treatment, and that she was prescribed medication.

The victim testified that at an unspecified time after the October 7, 2018 incident but before October 22, the victim's daughter requested to go to the Defendant's sister's home because the victim's daughter wanted to get a manicure and to play with her cousins. The victim said that she dropped off her daughter, although she knew the Defendant might be at the home. The victim said that although she had "issues" with the Defendant, she would not prevent her daughter from visiting family.

The victim testified that on October 22, 2018, at 7:00 a.m., she was about to leave her parents' home to return to work for the first time since the October 7 incident. She said that she lost the job she had at the time of the October 7 incident and that she had started a new job on October 22. She said that although she never thought the Defendant would come to her parents' home, the Defendant came to the home on the morning of October 22. She said that she pulled out of the driveway and drove a couple of blocks, that the Defendant's light blue convertible BMW appeared, that the Defendant sped to get in front of her, and that he used his car to "block [her] off," as though he were intending to run her off the road. She said that she put her car in reverse but that she parked the car near her parents' home. She said that the Defendant left his car and yelled for her to get out of her car. She said that she felt threatened, that she called 9-1-1, and that she dropped her cell phone inside her car to prevent the Defendant from knowing she called the police.

The recording of the 9-1-1 call was received as an exhibit and played for the jury. In the recording, the dispatcher requested the address of the emergency. A beeping sound is heard, along with the faint sound of a voice. However, the statements were indiscernible. The dispatcher repetitively stated, "Hello" and "Ma'am," before the call ended.

The victim testified that the beeping sound came from her car. When asked why she did not get out of her car and run away screaming for help, the victim said, "[I]t's just the fact that [you're] in fear . . . and then the fact that I . . . could be hit automatically right then, right there." She said that she got inside the Defendant's car because he threatened her while she sat in her car and that she left her cell phone inside her car. She said the Defendant told her that she was "testing" his patience. She said that she was afraid of being beaten again. She said that after she got inside the Defendant's car, he told her to tell him the truth, accused her of lying, showed her his phone, and said he had downloaded something to his phone that "showed him everything." She said the Defendant told her that he would "burn" her in the trunk of his car if she did not tell him the truth. She said

-4-

that she was scared of the Defendant and told him she needed to go to work and that eventually, he allowed her to leave after she gave him $20 for gas as he requested. She said that the incident ended because she was able to calm the Defendant. She said that the Defendant cried and said he "did not want to do this" and that she reciprocated, telling him she loved him, because she was scared. She said that after she gave him the money, the Defendant drove her to her parents' house. She said that she drove to work and that she called 9-1-1 again after work. A recording of the 9-1-1 call was played for the jury.

In the recording, the victim provided the dispatcher with her name, her parents' address, and her cell phone number. The victim told the dispatcher about the previous incident on October 7, 2018, and stated the "person" came to her home earlier in the morning. The victim expressed the desire for a restraining order, and the dispatcher asked for a case or compliant number associated with the October 7 incident. A young child is heard in the background as the victim provided the information to the dispatcher. The dispatcher stated that the report was filed at the hospital and asked who assaulted her. The victim identified the Defendant. When asked if the Defendant was at the home, she said that the Defendant was at the home earlier in the morning and that she placed a 9-1-1 call at that time, although she did not speak because he "made" her get inside his car and later returned her to the home. When the dispatcher asked if the Defendant "made" her get inside his car, she responded, "Yes." She said that the Defendant told her "he would do something violent" if she did not talk to him. She described the Defendant's erratic driving and said the Defendant looked as though he was going to hit her. She said that later, the Defendant told her he would take her to her parents' home if she gave him money. The dispatcher asked if the Defendant had ever choked her, and the victim responded, "Yes." She said her children were not in her car at the time of the incident.

In the recording, the dispatcher told the victim that police would respond to her home and to call 9-1-1 if the Defendant came to the home again. She told the dispatcher about the 9-1-1 call she placed earlier in the day and explained that she dropped her phone because she feared the Defendant would "beat her to death" if he saw her phone. She said she was "really scared."

The victim testified that the Defendant had an Instagram account. At this juncture, the parties stipulated that "the Instagram page belongs to [the Defendant] and the Instagram posts introduced into evidence were made by him." The Defendant's Instagram account was displayed for the jury, and an October 20, 2018 post reflected as follows:

> Lord kno a n---- wrong may GOD be wit me….. I cant undo the wrong
> I did but I can make it right!!!! I'm sorry T [breaking heart emoji] i really
> miss my kids even tho I act like I don't that's only when a n---- mad but still

I have no right….. I miss being around u guy..  I kno the situation between ain't no kiming from that…Daddy Love u guys love u [daughter's name] luv u [son's name] [heart emoji]…..[heart emoji]……..[heart emoji]………..Forgive me T for the hurt n pain broken….  You kno I'm right about everything don't worry I'm not saying Nuttin take my half love [heart emoji] u till

The victim stated that T referred to her and that "they" called her "Tia."  A video recording attached to the post was played for the jury and reflected a person holding a child's toy.  The victim said the recording showed their son's Transformer toy in the Defendant's hand.

Another October 20, 2018 Instagram video recording post was played for the jury.  In the recording, a man sat inside a convertible car with a BMW emblem on the steering wheel.  The man repeatedly stated, "It's really real."  The man left the car and showed the outside of the light-blue car.  The victim identified the man as the Defendant and said the car depicted in the recording was the same car the Defendant drove to her parents' home on October 22.

A recording of an August 10, 2019 jail call placed by the Defendant was played for the jury.  Simultaneous talking and low quality prevent deciphering all of the statements.  However, the recording reflects that the Defendant stated that he called "this b---- so she could drop me off at your house."  He said that after "that," he did not call "her" anymore.  He said "this b---- just popped up and never left."  He said he wanted to "get his rocks off" and laughed.

On cross-examination, the victim testified that the October 7, 2018 incident began because the Defendant believed she had been unfaithful.  When asked, "When he choked you, you did not lose consciousness during that incident," the victim responded, "Yes."  She agreed that the Defendant did not choke her with the cord.  She did not recall if the Defendant covered her nose and mouth as he choked her with his hands.  She said, though, she remembered the Defendant's hands "thrusted" on her throat.  She said it was possible he had covered her nose and mouth because at one point she could not breathe.  She did not dispute that she did not mention her nose and mouth being covered during her preliminary hearing testimony and during her police interview two days after the incident but said that many things happened during the incident and that her primary focus was being strangled and beaten.

The victim testified that on October 9, 2018, her daughter helped her son get ready for school.  She agreed that she did not obtain an order of protection until October 26.  She said that on the day she dropped off her daughter at the Defendant's sister's home, the

daughter told the victim that the Defendant was "still in that home." The victim agreed she did not call the police. She agreed that she mentioned pulling her car into a garage on October 22 but said that English was not her first language and that she might not have used the proper words. The victim stated that although she had scars from the October 7 incident, she had no other permanent injuries.

On redirect examination, she testified that she had an additional scar on the back of her left leg that was not shown to the jury previously because she had covered the scar with a tattoo.

The victim's eleven-year-old daughter testified that she lived with her mother, brother, and grandparents. She said she liked playing with the Defendant's sister's children. She said that on October 7, 2018, she, her brother, and the victim went to the Defendant's sister's home to visit her father. When asked what happened to the victim, the victim's daughter said, "Domestic violence by my dad." She said that although she did not see the incident, she heard her mother "getting abused" in another room. She said that she and her brother were in a bedroom, that her brother left the bedroom, that she heard the Defendant yell at her brother, and that her brother returned to the bedroom crying. She said that she told her brother not to leave the bedroom. She stated that although she heard the Defendant talking loudly to the victim, she did not remember what he said. She said the victim cried.

The victim's daughter testified that she did not call the police because the Defendant had taken her cell phone. She said that the Defendant returned her and her mother's cell phones on the day she and her mother dropped off her brother at school. She said that although the victim drove, the victim needed help walking. The victim's daughter said that she helped her brother get ready for school and that she and the victim drove to the hospital after dropping off her brother at school. The victim's daughter said that at the hospital, she saw bruises on the victim's body, including her leg, arm, and back. She said that the victim did not have the bruises and was capable of walking when they went to the Defendant's sister's house on October 7, 2018. She said she saw the bruises on the victim "right after the violence."

The victim's daughter testified that at an unspecified time after the victim was released from the hospital, the victim's daughter wanted to go to the Defendant's sister's home to have her fingernails painted and to play with her cousins. She said the Defendant was at the home at this time.

-7-

The victim's daughter testified that on the morning of October 22, 2018, she was at her grandparents' house but that her grandparents had already left for work. She said that as the victim left for work, she called the victim's cell phone. She said that she looked out the window and that she saw the victim's car with nobody inside.

On cross-examination, the victim's daughter testified that the Defendant and the victim were in the living room during the October 7, 2018 incident. She said that she did not see the Defendant on October 22.

Metropolitan Nashville Police Officer Calvin Graham, Jr., testified that he responded to the hospital on October 9, 2018, at approximately 11:00 a.m. Officer Graham recalled that the victim had bruises, scratches, and "scars" on her arms, legs, and neck. He said that he spoke with the victim while medical personnel treated her. He said the victim had scars on both sides of the neck and a large gash or laceration on the back of her neck, which he believed supported a conclusion that the incident involved strangulation. He said that the victim also had scratch marks on the right and back sides of her neck. He said the victim suffered a deep, more severe wound to the thigh.

On cross-examination Officer Graham testified that the victim reported the Defendant "attempted" to strangle her. Officer Graham said that the victim said she did not lose consciousness during the incident. He agreed that the victim did not want to obtain an order of protection on October 9, 2018, but said that the victim expressed a desire to obtain an order at a later date.

Metropolitan Nashville Police Officer Taylor Hurley testified that on October 22, 2018, at 5:21 p.m., she spoke to the victim at the victim's parents' home. She said the victim reported, without hesitation, the Defendant's threatening behavior, which included threatening to throw the victim in the trunk of his car and taking her wherever he wanted. Officer Hurley accompanied the victim to the police station to file charges against the Defendant for domestic assault. Officer Hurley said that although the Defendant had outstanding arrest warrants related to the October 7 incident and she knew the Defendant's address, she did not attempt to arrest the Defendant because the police department had a high call volume, preventing her from arresting the Defendant.

The Defendant elected not to present any proof.

Upon this evidence, the jury convicted the Defendant of three counts of aggravated assault in connection with the October 7, 2018 incident and domestic assault in connection with the October 22 incident. This appeal followed.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his aggravated assault convictions.  Although he does not dispute that an assault occurred, he argues that the evidence failed to establish that the victim suffered serious bodily injury, that he strangled or attempted to strangle the victim, and that he used or displayed a deadly weapon.  He requests that this court modify his convictions to domestic assault.  He does not challenge the domestic assault conviction in connection with the October 22 incident.  The State responds that the evidence is sufficient to support the convictions pursuant to all theories of aggravated assault.  We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).  The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence.  *Vasques*, 221 S.W.3d at 521.  The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

 "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).  A conviction may be based upon circumstantial evidence alone.  *See Dorantes*, 331 S.W.3d at 380-381.

As relevant to this case, a person is guilty of assault, in relevant part, if the person "[i]ntentionally, knowingly or recklessly causes bodily injury to another," or "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" T.C.A. § 39-13-101(a)(1)-(2) (2018) (subsequently amended). "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits assault as defined in § 39-13-101, and the assault . . . [r]esults in serious bodily injury to another," "[i]nvolved the use or display of a deadly weapon," or "[i]nvolved strangulation or attempted strangulation[.]" *Id*. § 39-13-102(a)(1)(A)(i), (iii), (iv).

## A.    Serious Bodily injury

Serious bodily injury is defined as an injury involving a substantial risk of death, a protracted unconsciousness, extreme physical pain, a protracted or obvious disfigurement, a protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty, or a broken bone of a child who is twelve (12) years of age or less. *Id.* 39-11-106(a)(34) (2019).

The record reflects in the light most favorable to the State that on October 7, 2018, the Defendant accused the victim of being unfaithful, examined the photographs on her cell phone, and became angry because he thought the victim had lied to him. The Defendant beat the victim with a coaxial cable cord and squeezed her neck with his hands, applying pressure with the force the victim rated an eight on a scale from one to ten. The victim became dizzy, had blurred vision, and was unable to speak, although she did not lose consciousness. The Defendant beat the victim with the cord constantly while asking her questions about infidelity, leaving lacerations, bruises, and scars on her leg and neck. During the assault, the Defendant stopped striking the victim with the cord and placed his hands around her neck. As the Defendant squeezed her neck, his fingernail punctured the skin, leaving a scar. She described her pain level after the assault as a ten on a scale from one to ten and said she was unable to walk out of the home because of the pain. The victim remained at the home until October 9 because she could not move from the pain she experienced. She could not walk without her daughter's assistance two days later and was unable to care for her children. The victim's daughter cared for her younger brother while they remained at the home. Likewise, the victim was unable to work after the incident because of her injuries.

The record reflects that the victim experienced extreme pain from the injuries inflicted by the Defendant. The record likewise reflects that the injuries inflicted by the Defendant resulted in scars to the victim's neck and leg. A scar constitutes a protracted or obvious disfigurement for establishing serious bodily injury. *See State v. Charles Eugene Darvin, Jr.*, M2018-01669-CCA-R3-CD, 2019 WL 4440220, at *4 (Tenn. Crim. App. Sept. 17, 2019), *perm. app. denied* (Tenn. Jan. 15, 2020); *State v. Deonte Matthews*, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. October 13, 2012), *perm. app. denied* (Tenn. May 16, 2012); *State v. Richard Dale Capps*, No. M2010-02143-CCA-R3-CD, 2012 WL 3800848, at *7 (Tenn. Crim. App. Sept. 4, 2012), *perm. app. denied* (Tenn. Feb. 13, 2013). As a result, we conclude that the evidence is sufficient to support the Defendant's conviction for aggravated assault resulting in serious bodily injury to another. He is not entitled to relief on this basis.

## B.     Strangulation or Attempted Strangulation

Strangulation is defined as "intentionally or knowingly impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person, regardless of whether that conduct results in any visible injury or whether the person has any intent to kill or protractedly injure the victim." T.C.A. § 39-13-102(a)(2).

The record reflects in the light most favorable to the State that during the assault, the Defendant squeezed the victim's neck with his hands. The victim described the amount of pressure applied to her neck by the Defendant's hands as an eight on a scale of one to ten. The Defendant's fingernail punctured the skin on the victim's neck as he squeezed her neck. Although she did not lose consciousness, she felt dizzy, could not speak, could not breathe, and had blurred vision. Officer Graham saw markings on both sides of the victim's neck, which he testified were indicative of strangulation, and a large gash or laceration on the back of the neck. As a result, we conclude that the evidence is sufficient to support the Defendant's conviction for aggravated assault involving the use of strangulation or attempted strangulation. He is not entitled to relief on this basis.

## C.     Deadly Weapon

A deadly weapon is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury" or "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id*. § 39-11-106(a)(5)(A), (B). If an instrument or weapon is not a deadly weapon per se, such as a firearm, "it will only be considered a deadly weapon . . . if the defendant in a particular case actually used or intended to use the item to cause death or serious bodily injury." *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *see State v. McGouey*, 229 S.W.3d 668, 673 (Tenn. 2007); *Morgan v. State*, 415 S.W.2d 879, 882 (Tenn. 1967).

The record reflects in the light most favorable to the State that although the coaxial cable cord was not a deadly weapon per se, the manner in which the Defendant used the cord made it capable of causing serious bodily injury. The Defendant repeatedly struck the victim with the cord, causing extreme physical pain. As a result, the Defendant used the cord in a manner that caused serious bodily injury. *See State v. Eaves*, 959 S.W.2d 601, 604 (Tenn. Crim. App. 1997) (concluding that the manner in which the defendant used a pen to stab the victim's hand, which resulted in a puncture wound, rendered the pen a deadly weapon because it was capable of causing extreme pain or obvious disfigurement). As a result, we conclude that the evidence is sufficient to support the Defendant's

-11-

conviction for aggravated assault involving the use of a deadly weapon. He is not entitled to relief on this basis.

## II.     Jail Call Recording

The Defendant contends that the trial court erred by admitting a portion of the Defendant's recorded jail telephone call. He argues that his characterization in the call of the victim as a "b----" and that his stating he contacted the victim because he wanted to "get his rocks off," along with his laughter, were irrelevant pursuant to Tennessee Rules of Evidence 401 and 402. He likewise argues that even if the evidence were relevant, any probative value was substantially outweighed by the danger of unfair prejudice, rendering it inadmissible pursuant to Tennessee Rule of Evidence 403. The State responds that the trial court did not abuse its discretion by admitting the recording because the evidence provided contextual background to the Defendant's relationship with the victim. Alternatively, the State asserts that any error was harmless.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The Defendant filed a pretrial motion to exclude from evidence any recordings of jail telephone calls placed by the Defendant. He argued that the calls were irrelevant, ambiguous, and contained material that would unfairly prejudice his defense. Initially, the State sought to introduce recordings of four calls. However, only a portion of one jail call was played for the jury.

-12-

Regarding the recording played at the trial, the State argued that the Defendant, who was speaking with his sister, referred to the victim as a "b----." The prosecutor argued that the statement was relevant because it was a derogatory term for a woman and showed the Defendant's animosity toward the victim. The prosecutor stated that redacting the word would permit the defense to argue that the Defendant could have been referring to anyone rather than the victim. Likewise, the prosecutor argued that the Defendant's stating "the b---- just popped up and never left" was relevant to the victim's anticipated testimony that she was unable to leave the home because she had been beaten badly. Last, the prosecutor argued that the Defendant's statement that he wanted to "get his rocks off" was relevant to show the Defendant was referring to the victim during the call because she and the Defendant had been in a romantic relationship and had two children.

The defense did not challenge the portion of the recording in which the Defendant referred to being dropped off at the home but argued that the Defendant's "language directed to" the victim was inadmissible because it was "overly prejudicial anytime somebody calls somebody a name." The defense argued, as well, that reference to "getting his rocks off" was irrelevant and highly prejudicial.

The trial court determined that the recording was relevant to show the Defendant's "acknowledgement of what's going on, the date of one of these allegations, and why he is there and what's occurring." Specific to the Defendant's use of profanity, the court determined that "today's world [is] a little different than 1980." The court said that it did not know the meaning of "getting his rocks off" and that if a statement were subject to various impressions or interpretations, it became a "weight issue for the jury." The court found that the recording placed into context what was being discussed by the Defendant and his sister.

As a preliminary matter, the State argues for the first time on appeal that the Defendant's statements in the jail call were relevant to providing contextual background pursuant to *State v. Gilliland*, 22 S.W.3d 266 (Tenn. 2000). Such evidence is usually related to other crimes, wrongs, and acts by a defendant. In order for such evidence to be admissible, the State must establish that the evidence is necessary to prevent a chronological or conceptual void in the State's case-in-chief and to prevent significant confusion as to the material issues or evidence. *Id.* at 272. Likewise, the State must show that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. The prosecutor did not argue in the trial court that the recording provided contextual background pursuant to *Gilliland*.

However, the State argued that the recording reflected that the Defendant discussed the victim and the October 7 incident. The prosecutor argued that the Defendant's derogatory terminology showed his animosity toward the victim. The prosecutor, likewise, argued that the Defendant's stating the victim came to the home and never left was in direct contravention of the victim's anticipated testimony that she was unable to leave the home because of the injuries she sustained during the October 7 incident. The prosecutor also argued that the Defendant's statement that he wanted to "get his rocks off" was relevant to show the Defendant was referring to the victim during the call because she and the Defendant had been in a romantic relationship and had two children.

The record supports the trial court's determinations that the Defendant's statements during the call showed the Defendant's knowledge of the October 7 allegations. The Defendant's statements about what occurred during the incident conflicted with the victim's testimony and showed a lack of remorse for his conduct when considered in light of his defense that a misdemeanor assault occurred, rather than an aggravated assault. *See* Tenn. R. Evid. 401, 403. Likewise, the record supports the trial court's determination that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice in light of the victim's testimony about the incident, along with the medical records and photographs related to her injuries. At the trial, the Defendant did not dispute that he had assaulted the victim. Therefore, the trial court did not abuse its discretion by admitting the relevant evidence. The Defendant is not entitled to relief on this basis.

### III.    Sentencing

The Defendant contends that the trial court erred by imposing the maximum sentence for his aggravated assault convictions and argues fifteen years' confinement is excessive. He does not challenge his sentence for domestic assault. He asserts that the court erred by applying enhancement factors and that the court should have applied the catchall mitigating factor. The State responds that the trial court did not abuse its discretion by imposing a fifteen-year sentence.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*,

823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

At the sentencing hearing, the presentence report was received as an exhibit. The thirty-two-year-old Defendant had previous convictions for three counts of robbery, being a felon in possession of a handgun, assault, child abuse and neglect, two counts of burglary of an automobile, driving while his license was suspended, and misdemeanor marijuana possession. The report reflects that the Defendant failed to appear for eight court appearances.

The presentence report reflects that the Defendant left school after the tenth grade. He reported being in State custody from ages twelve to eighteen and changing schools frequently. He reported having good mental and physical health. The Defendant reported first using marijuana at age twelve, first using cocaine at age fifteen, first drinking alcohol at age fifteen, and taking one to two Xanax daily when he was age twenty-six. The report reflects that during his confinement at the jail in connection with the present case, the Defendant tested positive for buprenorphine on December 5, 2018, and March 4, 2019.

The presentence report reflects that the Defendant was born in a "refugee camp" in Thailand and that, at age six, he immigrated to the United States with his parents and three sisters. The report reflects that the Defendant's parents divorced when he was age thirteen and that he stated life was difficult without a father figure. The Defendant reported having a close relationship with his mother and one sister. The Defendant reported that he had been unemployed since 2014 and that his longest period of employment was nine to ten months.

The presentence report reflects that the Defendant had juvenile delinquency adjudications and that the Defendant's juvenile court record was attached to the trial judge's copy of the report. However, the adjudication records are not attached to the

presentence report and are not included in the appellate record. The Strong-R assessment reflects that the Defendant had a score of "high" for violence.

The presentence report reflects that the Defendant submitted a written statement to the investigator. In the statement, the Defendant apologized for what he had done and for his mistakes. He said that he was learning to become a man and to learn from his mistakes. He acknowledged his lack of a father figure and said that he was wrong. He said that he was fighting to become a better person, father, and role model for others.

The victim testified that the October 7, 2018 incident was not the first incident of violence. She said that, at an unspecified time, she and the Defendant were inside a car when he "just started beating" her in front of their daughter. She said, though, she had never seen the Defendant use violence against their children.

Somphane Xayyasith, the Defendant's sister, testified that the Defendant was the youngest of four children. She said that she was born in Thailand and that the family immigrated to the United States when the Defendant was age three or four. She said that she and her family stayed at a refugee camp before entering the United States, although she was too young to recall any details about the family's time there. She said that learning English and acclimating to American culture was difficult initially.

Ms. Xayyasith testified that family life was good initially when they arrived in the United States but that their parents' marriage disintegrated after her father wanted to "party" with friends and have "other relationships." She recalled that before her parents separated, their mother worked two jobs, was unable to spend much time with the children, and gave her paychecks to her father. Ms. Xayyasith said that her father controlled the money and spent the income "on having fun with his friends." She described her father as controlling and recalled an incident in which her father locked everyone inside the home. She said she and the Defendant snuck out of the home through a window. She said that her father attempted to "whip" the children but that her mother would not allow it. Ms. Xayyasith said that she feared her father and that he was not a role model for the Defendant.

Ms. Xayyasith testified that her father remarried after her parents divorced. She recalled that the Defendant lived with their father for a period of time and that the Defendant saw that their father treated his stepchildren better than his biological children. Ms. Xayyasith said that the Defendant ran away from their father's home and left Tennessee. She recalled that, at an unspecified time, she and the Defendant lived with their other sisters. Ms. Xayyasith said that although she did not understand at the time, she learned later that their oldest sister had molested the Defendant.

-16-

Ms. Xayyasith testified that the Defendant had lived at her home before his arrest and that he was "good" with her seven children. She noted that their mother and friends were at the sentencing hearing to support the Defendant. Ms. Xayyasith requested that the court give the Defendant "a chance."

On cross-examination, Ms. Xayyasith testified that the clothes the Defendant wore at the sentencing hearing were yellow-colored because he had been in a fight at the jail. She clarified that her children's father was in jail with the Defendant, that someone attacked her children's father, and that the Defendant intervened to help her children's father. She agreed that the Defendant had abused drugs previously but denied that he had abused alcohol. She agreed the Defendant had been given previous opportunities to rehabilitate.

Thongkham Xayyasith, the Defendant's mother, testified that she and her family originally lived in Laos but that the family fled because it was a communist country. She said that they went to Thailand, where they stayed in a refugee camp before immigrating to the United States. She said that the Defendant was age two when the family stayed at the refugee camp. She said that she and her family were provided "just enough" daily food at the camp but that they went hungry at times. She said most of the people at the camp were desperate to come to the United States.

Mrs. Xayyasith testified that the children's father did not support the household or the children and that over time he was never home. She recalled that they argued frequently and said that because she worked from 3:00 p.m. to 7:00 a.m., she could not socialize as her husband wanted. She said that he never cared for any of the children and frequently became mad at the children. She said that after the divorce, the Defendant lived with his father, and the daughters lived with her. She said that she had been unaware that the Defendant was not being provided sufficient food and that he had begun breaking into homes.

Mrs. Xayyasith testified that in her culture, the husband was "king," "made the rules," and treated others how he wanted. She said that the Defendant had never been violent toward her and that he cared for his sisters, nieces, and nephews. She asked the trial court for mercy. On cross-examination, Mrs. Xayyasith testified that the Defendant was her only child with a criminal history.

Upon questioning by the trial court, Mrs. Xayyasith testified that the Defendant was placed in "State custody" between the ages of twelve and eighteen. She said that although she did not know where the Defendant lived during this time, the Defendant was in the custody of the Department of Children's Services. She said she saw the Defendant almost every weekend when he was in State custody.

-17-

After the sentencing hearing, the trial court entered a written order. The order reflects that the parties agreed the Defendant was a Range III, persistent offender and that the court merged the aggravated assault convictions. The order reflects that the court considered the evidence at the sentencing hearing, the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct, evidence of enhancement and mitigating factors, statistical information provided by the Administrative Office of the Courts, the results of the validated risk and needs assessment, and the Defendant's potential for rehabilitation.

The trial court rejected the Defendant's request for application of mitigating factors. *See* T.C.A. § 40-35-113(13) (2019). The court stated it was "particularly sensitive" to the childhood traumas suffered by the Defendant and "recognize[d] the destabilizing impact that fleeing his homeland as a refugee and immigrating to a new country at such a young age likely had on the Defendant." The court found, though, none of the statutory mitigating factors applied. The court found that although the Defendant's childhood history provided explanations for the Defendant's conduct, the evidence did not mitigate the Defendant's culpability.

Regarding enhancement factors, the trial court found that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. *See id*. § 40-35-114(1) (2019). The court found that although the Defendant's previous felony convictions were used to classify him as a Range III, persistent offender, factor (1) applied in light of the Defendant's previous misdemeanor convictions for assault, child neglect, and marijuana possession and in light of his history of assaultive behavior toward the victim. The court found that the Defendant had engaged in at least one uncharged domestic assault based upon the victim's testimony at the sentencing hearing, in which she described an incident inside a car. The court found that although the Defendant did not have a particularly lengthy misdemeanor criminal history, the "apparent pattern of assaultive behavior" concerned the court.

The trial court, likewise, found that the Defendant possessed or employed a deadly weapon during the commission of the offense. *See id*. § 40-35-114(9). The court found that this factor did not apply to the aggravated assault conviction involving the use or display of a deadly weapon because of the elements of the offense but that the factor applied to the remaining convictions. The court found that the manner in which the Defendant used the coaxial cable cord rendered it a deadly weapon, although a cord was not typically considered a deadly weapon. The court found, as well, that enhancement was warranted because the Defendant was adjudicated to have committed delinquent acts as a juvenile that would have constituted a felony if committed by an adult. *See id*. § 40-35-114(16). The court found that the Defendant's juvenile record showed adjudications for felony

-18-

escape, theft of property valued at $1,000 or more but less than $10,000, evading arrest by a motor vehicle, burglary of an automobile, and aggravated assault involving the use or display of a deadly weapon. The court stated that it was concerned the Defendant had been adjudicated delinquent for aggravated assault and stated that it was another violent offense similar to the convictions in the present case.

The trial court imposed fifteen-year sentences for each aggravated assault conviction and eleven months, twenty-nine days for domestic assault. The court declined to impose consecutive service after finding that concurrent service was consistent with the overall principles of sentencing. The court ordered the Defendant to serve his fifteen-year-sentence in confinement because the Defendant was ineligible for probation and community corrections. *See id*. §§ 40-35-303(a) (2019) (subsequently amended) (probation eligibility); 40-36-106(a)(1) (2019) (subsequently amended) (community corrections eligibility).

The record reflects that aggravated assault, regardless of whether the offense results in serious bodily injury, involves the use or display of a deadly weapon, or involves strangulation or attempted strangulation, is a Class C felony. *Id*. § 39-13-102(e)(1)(A)(ii). A Range III sentence for a Class C felony is ten to fifteen years. *Id*. § 40-35-112(c)(3) (2019). The trial court imposed fifteen years' incarceration, which is a within-in range sentence. As a result, the court's determinations are afforded a presumption of reasonableness. *Bise*, 380 S.W.3d at 708.

The Defendant argues that the trial court should not have applied enhancement factor (1) because his previous misdemeanor convictions were not so extensive as to constitute a previous history. He notes that the assault and child neglect convictions arose from the same incident and that all of the misdemeanor convictions occurred when he was ages eighteen and nineteen. The record reflects that the court relied upon the Defendant's misdemeanor convictions and upon the victim's testimony about an additional incident of domestic assault. The presentence report reflects misdemeanor convictions for assault, drug possession, and child abuse. The victim in the present case testified at the sentencing hearing that, at an unspecified time before the October 7, 2018 incident, she and the Defendant were inside a car when he "just started beating" her in front of their daughter.

Additionally, the trial court, when discussing enhancement factor (16), found that the Defendant had been adjudicated delinquent for offenses that would have constituted a felony if committed by an adult. The presentence report stated that the Defendant's juvenile record was "attached to the judge's copy of the presentence report." However the

juvenile record relied upon by the trial court is not included in the appellate record.[1]  The court found that the Defendant had juvenile adjudications for felony escape, felony theft, evading arrest by a motor vehicle, burglary of an automobile, and aggravated assault involving the use or display of a deadly weapon.  *See State v. LaQuinton Brown*, No. E2015-00899-CCA-R3-CD, 2016 WL 3633474, at *14 (Tenn. Crim. App. June 29, 2016) ("This court has repeatedly 'approved the consideration of a defendant's history of juvenile adjudications in determining whether a defendant has an extensive record of criminal activity.'") (quoting *State v. Carlos Campbell*, No. E2014-00697-CCA-R3-CD, 2015 WL 6155893, at *22 (Tenn. Crim. App. Oct. 15, 2015)), *perm. app. denied* (Tenn. Oct. 20 2016); *Lamario Sumner v. State*, No. W2009-00453-CCA-R3-PC, 2010 WL 4544955, at *8 (Tenn. Crim. App. Nov. 10, 2010).  Likewise, the Defendant admitted during the presentence investigation to unlawfully using controlled substances, and he tested positive for buprenorphine twice while in confinement at the jail.  The record supports the trial court's determinations, and we conclude that the court did not abuse its discretion by applying this enhancement factor.

The Defendant argues that the trial court erred by applying enhancement factor (9) to the aggravated assault convictions involving the use of strangulation and resulting in serious bodily injury.  He asserts that the coaxial cable cord was not a deadly weapon and even if the cord were a deadly weapon, it was not used during the incident involving strangulation or attempted strangulation.  The record reflects that although the trial court did not apply this factor to the aggravated assault conviction involving the use of a deadly weapon because of the elements of the offense, the court applied this factor to the Defendant's remaining convictions.

As we have previously determined, the manner in which the Defendant used the coaxial cable cord during the October 7 incident rendered it a deadly weapon, and the record supports the trial court's determination in this regard.  The use or display of a deadly weapon is not an element of aggravated assault resulting in serious bodily injury to another person, and the record reflects that the victim was struck multiple times with the cord,

---

[1] We acknowledge appellate counsel states in his brief that he contacted the Davidson County Clerk's Office to obtain a duplicate of the trial court's copy of the presentence report, which was purported to have included the Defendant's juvenile record, and/or the Defendant's juvenile record from the trial court record and that appellate counsel was advised that neither document was included in the trial court file.  Appellate counsel concedes that trial counsel did not challenge the application of enhancement factor (16).  Therefore, we "conclusively presume" that the trial court's determinations in connection with the Defendant's juvenile record were correct.  *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987) (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993).

leaving scars.  As a result, the trial court did not abuse its discretion by applying enhancement factor (9) to this conviction.

Relative to the aggravated assault conviction involving the use of strangulation or attempted strangulation, the record reflects that the October 7 incident began with the Defendant's striking the victim repeatedly with the cord as she lay on the couch attempting to protect herself from the beating.  At some point during the altercation, the Defendant stopped striking her with the cord and placed his hands around her neck and strangled her, although she did not lose consciousness.  The record does not reflect that the cord was used to strangle the victim.  However, enhancement factor (9) requires, in relevant part, only that the Defendant have "possessed or employed" the cord during the commission of the offense.  *See id*. § 40-35-114(9).  The record reflects that the Defendant possessed the cord during an assault involving strangulation.  As a result, the trial court did not abuse its discretion by applying enhancement factor (9) to this conviction.

Finally, the Defendant argues that the trial court erred by failing to apply mitigating factor (13) based upon evidence of his traumatic immigration to the United States, traumatic childhood, and statement of remorse to the presentence investigator.  The record reflects that the court considered evidence of the Defendant's immigration to the United States and his childhood.  *See id.* § 40-35-113(13).  However, the court declined to apply mitigating factor (13) because this evidence provided explanations for the Defendant's criminal conduct but did not excuse his culpability.  The court expressed its concern that although the Defendant had experienced trauma, he had engaged in a pattern of violence, which included domestic assault, aggravated assault, and robbery.  The record reflects that the court considered the mitigation evidence, including the presentence report in which the Defendant's statement is reflected, and determined that the Defendant's violent conduct was not mitigated by the evidence.  We conclude that the court did not abuse its discretion by declining to apply this mitigating factor.

Upon review, we conclude that the Defendant has failed to demonstrate any abuse of discretion in the trial court's application of enhancement and mitigating factors in connection with his aggravated assault convictions.  We conclude, as well, that the Defendant has not demonstrated that the court abused its discretion in imposing the effective fifteen-year sentence.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-21-